IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

RICHARD D. BEAN,                    )
                                    )
            Plaintiff,              )
                                    )
    v.                              )   Case No. 04-3439-CV-S-REL-SSA
                                    )
JO ANNE B. BARNHART, Commissioner   )
of Social Security,                 )
                                    )
            Defendant.              )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Richard D. Bean seeks review of the final decision of the Commissioner of Social Security denying his application for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401, et seq., and for supplemental security income benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq. Plaintiff argues that the ALJ erred in: (1) failing to find his lumbar spine impairment met or equaled the requirements of Listing § 1.04 for disorders of the spine; (2) failing to give controlling weight to his trating physician's opinions; (3) relying, instead, on the opinions of a non-examining, non-physician; and (4) improperly discrediting his subjective complaints of pain. I find that the ALJ properly determined that (1) Plaintiff's impairments did not meet or equal the requirements of Listing § 1.04, (2) assigned the appropriate amount of weight to the medical evidence, (3) did not rely on the opinion of a non-examining non-physician, and (4) correctly discredited Plaintiff's subjective complaints of pain. Therefore, Plaintiff's Motion for Summary Judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

Plaintiff submitted a claim for Social Security Disability Insurance Benefits and/or

Supplemental Security Income Benefits on August 15, 2002, alleging that he had been disabled since July 24, 2002. Plaintiff's disability stems from a protruding, bulging disc in his lower back. Plaintiff's application was denied initially and upon reconsideration. On January 13, 2004, a hearing was held before an Administrative Law Judge. On February 24, 2004, the ALJ found that Plaintiff was not under a "disability" as defined in the Act. On August 11, 2004, the Appeals Council denied Plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). This same standard also applies to Title XVI, as the "final determination of the Commissioner of Social Security after a hearing . . . shall be subject to judicial review as provided in section 405(g)." 42 U.S.C. § 1383(c)(3). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987) (citing Steadman v. Sec. & Exch. Comm'n, 450 U.S. 91, 99 (1981)).

2

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n.5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III.  BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A) (governing disability insurance benefits); 42 U.S.C. § 1382c(a)(3)(A) (governing supplemental security income benefits). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. See Wilcutts v. Apfel, 143 F.3d 1134, 1137 (8th Cir. 1998) (discussing burden in supplemental security income benefits case); see also Griffon v. Bowen, 856 F.2d 1150, 1153-54 (8th Cir. 1988) (discussing burden in disability insurance benefits case); McMillian v. Schweiker, 697 F.2d 215, 220-21 (8th Cir. 1983) (discussing burden in disability insurance benefits case).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. The five-step sequential

3

evaluation process used by the Commissioner is outlined in 20 C.F.R. §§ 404.1520(c) and 416.920(c) and can be summarized as follows:

1.    Is the claimant performing substantial gainful activity?
            Yes = not disabled.
            No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

            No = not disabled.
            Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

            Yes = disabled.
            No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

            No = not disabled.
            Yes =  go to next step where burden shifts to Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

            Yes = disabled.
            No = not disabled.

## IV.  THE RECORD

The record consists of the testimony of Plaintiff and vocational expert Darrell W. Taylor, in addition to documentary evidence admitted at the hearing.

### A.  ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

Plaintiff's earnings record indicates that he eared the following income from 1983

4

through 2002:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1983 | $ 5,388.00 | 1993 | $ 18,483.77 |
| 1984 | 4,336.00 | 1994 | 19,189.75 |
| 1985 | 0.00 | 1995 | 18,175.51 |
| 1986 | 4,965.49 | 1996 | 19,379.68 |
| 1987 | 7,375.88 | 1997 | 17,588.00 |
| 1988 | 2,849.68 | 1998 | 21,149.29 |
| 1989 | 5,126.72 | 1999 | 26,491.18 |
| 1990 | 13,490.23 | 2000 | 23,645.66 |
| 1991 | 13,378.91 | 2001 | 25,846.59 |
| 1992 | 18,013.87 | 2002 | 20,080.35 |

(Tr. at 86). Plaintiff's August 15, 2002, Application for Disability Insurance Benefits indicates that he did not work or have earnings in 1985 (Tr. at 85). Moreover, he only worked part of the year in 1988 before being layed off (Tr. at 85).

### Disability Report - Field Office

On August 15, 2002, Matthew Fuller, Field Office Claim Representative indicated that during a face-to-face interview, Plaintiff had difficulty standing and walking (Tr. at 102). He noted, "After sitting for the length of the interview, [Plaintiff] stood slowly. When leaving the office he walked in a hunched position." (Tr. at 102).

### B. SUMMARY OF MEDICAL RECORDS

On April 17, 2002, Plaintiff was seen by Dr. Michael D. Ball. D.O. (Tr. at 145). He reported progressively worsening low back pain since a motor vehicle accident on October 24, 2001 (Tr. at 145). He described pain over the lumbosacral[1] junction (Tr. at 145). Plaintiff

---

[1]"Relating to the lumbar vertebrae and the sacrum." STEDMAN'S MEDICAL DICTIONARY 998 (26th ed. 1995). "Lumbar" relates to "the loins, or part of the back and sides between the ribs and the pelvis." Id. The sacrum is "[t]he large heavy bone at the base of the spine, which is made up of fused sacral vertebrae. The sacrum is located in the vertebral column, between the lumbar vertebrae and the coccyx. It is roughly triangular in shape and makes up the back wall of the pelvis." MedicineNet.com, Definition of Sacrum, at http://www.medterms.com/script/main/art.asp?articlekey=7936 (last visited Jan. 23, 2006).

related that he had difficulty sitting and operating the forklift at work and stated that his back

pain sometimes radiated into his right leg (Tr. at 145). Physical examination revealed:

> Patient ambulates without the use of any assistive device. Gait & station is
> normal. Pain on forward bending over the [lumbosacral] junction and throughout
> the [paravertebral muscle] in the [lumbar] spine. Forward bending is limited to
> approx. 30º at the onset of pain. He is able to flex to approx[imately] 70º, but at
> that point he develops rigidity & is unable to bend further. Side-bending [right
> leg] 10º. Negative [straight leg raising] test [bilaterally]. No evidence of
> radiculopathy.[2] No muscle atrophy[3] or sensory deficit in [legs]. Pt has a difficult
> time ambulating initially when he gets up off the treatment table & has a slightly
> forward bent posture. X-ray of the l-spine did not reveal any evidence of
> [fracture] or dislocation. No evidence of any disk space narrowing.

(Tr. at 145). Dr. Ball ordered physical therapy two times a week for four weeks (Tr. at 145).

Plaintiff underwent physical therapy at Physical Therapy Specialists Clinic, Inc. Before

receiving treatment, Plaintiff first completed a Oswestry Low Back Pain Questionnaire[4] (Tr. at

197). He offered the following assessments: (1) "The pain is bad, but I can manage without

having to take pain medication"; (2) "I can take care of myself normally, but it increases my

pain"; (3) I can lift heavy weights, but it causes increased pain"; (4) Pain prevents me from

walking more than 1 mile"; (5) "Pain prevents me from sitting for more than 1 hour"; (6) "I can

stand as long as I want, but it increases my pain"; (7) "I sleep less than 6 hours"; (8) "I sleep less

---

[2]Radiculopathy is "[a]ny disease of the spinal nerve roots and spinal nerves." MedicineNet.com, Definition of Radiculopathy, at http://www.medterms.com/script/main/art.asp?articlekey=14161 (last visited Jan. 23, 2006).

[3]"Atrophy" is "[a] wasting of tissues, organs, or the entire body, as from death and reabsorption of cells, diminished cellular proliferation, decreased cellular volume, pressure, ischemia, malnutrition, lessened function, or hormonal changes." STEDMAN'S MEDICAL DICTIONARY 165.

[4]The Oswestry Low Back Pain Questionnaire is a self-reporting questionnaire, in which the patient gives his or her doctor information about how back pain has affected his or her ability to manage in everyday life.

than 4 hours"; (9) "My social life is normal, but it increases my level of pain"; (10) "I can travel anywhere, but it increases my pain"; (11) "My normal homemaking/job activities increase my pain, but I can still perform all that is required of me" (Tr. at 197).

On April 23, 2002, Plaintiff underwent the lumbar spine assessment and reported back pain and "very bad leg pain" (Tr. at 198). Examination revealed loss of motion in both extension and flexion (Tr. at 199). Physical therapy was scheduled two times a week for four weeks (Tr. at 199).

On April 26, 2002, Plaintiff reported to physical therapy with no new complaints (Tr. at 201). He rated his pain at 3/10, but stated that he just got up prior to reporting to physical therapy (Tr. at 201). On April 29, 2002, Plaintiff rated his pain at 2/10, and said he experienced a general reduction of symptoms over the weekend due to reduced activities (Tr. at 201). On May 1, 2002, Plaintiff reported 3/10 low back pain (Tr. at 205). His pain was centralized and he had experienced intermittent radicular[5] pain with different work-related tasks (Tr. at 205). On May 6, 2002, Plaintiff rated his pain at 3/10 (Tr. at 206). He reported a pain level of 3/10 on May 9, 2002, and noted increased symptoms after the MedX evaluation on his last visit with subsequent reduction in "soreness" (Tr. at 206). Plaintiff reported a pain level of 3/10 on May 13, 2002 (Tr. at 206).

On May 15, 2002, Plaintiff reported a 2/10 pain level (Tr. at 206). He voiced continued increased back pain with heaving lifting activities at work that worsened as the day progressed (Tr. at 206). Plaintiff completed a second Oswestry Low Back Pain Questionnaire, with the following results: (1) "The pain is bad, but I can manage without having to take pain

_____

[5]Of, relating to, or involving a nerve root.

medication"; (2) "I can take care of myself normally without causing increased pain"; (3) "I can lift heavy weights, but it causes increased pain"; (4) "Pain prevents me from walking more than 1 mile"; (5) "I can only sit in my favorite chair as long as I like"; (6) "I can stand as long as I want, but it increases my pain"; (7) "My social life is normal, but it increases my level of pain"; (8) "I can travel anywhere, but it increases my pain"; and (9) "My normal homemaking/job activities increase my pain, but I can still perform all that is required of me" (Tr. at 210).

Plaintiff's physical therapist summarized his course of treatment as follows:

Richard Bean has been seen for a total of eight physical therapy visits, including his initial evaluation on 4/23/02. The patient's treatment has consisted of treadmill gaiting, spinal stabilization exercises, McKenzie exercises to normalize range of motion, and initiation of lumbar MedX on 5/6/02 to improve low back range of motion and strength. The patient gives improved subjective report with the patient currently reporting a 2/10 pain level to the low back. The patient notes increased symptoms after "a lot of lifting" at work. The patient was reassessed over objective measures with results as follows:

| MOVEMENT LOSS | 4/22/02 | 5/15/02 | DIFFERENCE |
|---|---|---|---|
| Lumbar flexion | Major | Moderate/min | Improvement |
| Extension | Major/mod | Moderate/min | Improvement |
| Right side glide | Minimal | Minimal | Same |
| Left side glide | Minimal | Minimal | Same |

| DYNAMIC LUMBAR MEDX | 5/9/02 | 5/15/02 | DIFFERENCE |
|---|---|---|---|
| Range of motion | 0-48 degrees | 0-51 degrees | +3 degrees |
| Resistance (foot pounds) | 160 lbs | 183 lbs | +23 lbs |
| Repetitions | 16 reps | 18 reps | +2 repetitions |
| Time under load (secs) | 140 secs | 140 secs | Same |

| BTE STATIC STRENGTH | 5/9/02 | 5/15/02 | DIFFERENCE |
|---|---|---|---|
| Quadriceps right | 77.8 lbs | 76.4 lbs | -1% |
| Quadriceps left | 85.2 lbs | 69.5 lbs | -18% |
| Hamstrings right | 59.8 lbs | 96.9 lbs | +62% |
| Hamstrings left | 55.6 lbs | 79.1 lbs | +42% |

8

| OSWESTRY PAIN QUESTIONNAIRE | 4/22/02 | 5/15/02 | DIFFERENCE |
|---|---|---|---|
| Perceived functional limitations | 26% | 12% | 53.8% improvement |

As you can see, Mr. Bean is progressing well with increased strength and range of motion consistent with his improved subjective report. The patient is currently scheduled for four more sessions on lumbar MedX including reassessment on MedX session number eight. The patient's current physical therapy orders have expired. We will await further orders for continued exercise progression of Mr. Bean at this time.

(Tr. at 209).

On May 20, 2002, Dr. Ball "rechecked" Plaintiff's back (Tr. at 145). Plaintiff reported that the physical therapy had not improved his pain but had improved his motion (Tr. at 145). He stated that his back pain was exacerbated by extended standing, forward bending, or lifting (Tr. at 145). An examination of his back revealed paravertebral muscle spasms at L1-5 and tenderness on forward bending over the lumbosacral junction and spinous process of L4-5 (Tr. at 145). The straight leg raise test was negative and there were no signs of muscle atrophy (Tr. at 145). Dr. Ball prescribed Plaintiff 800 mgs of Ibuprofen along with Prevacid to protect his stomach (Tr. at 145).

On May 21, 2002, Plaintiff presented to physical therapy with orders for fifteen additional treatment sessions (Tr. at 213). On May 23, 2002, Plaintiff reported a pain level of 2/10 (Tr. at 213). On May 29, 2002, Plaintiff reported a 2/10 pain level, but stated his pain reduced to 1/10 post-treatment (Tr. at 213). On May 31, 2002, Plaintiff experienced pain at a level of 4/10 and attributed the pain to work activities, as the symptoms occurred near the end of the work day on May 29, 2002 (Tr. at 213).

Similarly, Plaintiff reported a 2/10 pain rating on June 3, 2002 (Tr. at 217). He noted

9

increased symptoms with prolonged bending or lifting activities at work (Tr. at 217). His physical therapist stated, "Patient has made very good improvements in overall strength gains. Patient now has strength above that of standard norms and demonstrates good flexion to extension ratio. Patient does continue to have limitations in regards to full range of motion secondary to patient's size and anatomical limitations" (Tr. at 220).

On June 5, 2002, Plaintiff experienced increased stiffness, possibly due to a weather change and increased activities; he rated his pain level at 3/10 (Tr. at 217). Plaintiff did not have any new complaints on June 11, 2002, and stated he had 0/10 pain although his pain was exacerbated over the weekend by activity (Tr. at 217). On June 13, 2002, Plaintiff reported a 2.5/10 pain level and attributed his increased pain to extensive lifting and driving the fork lift at work (Tr. at 217).

On June 18, 2002, Plaintiff stated his pain level was 2/10; he reported generally improved tolerance to work activities with an occasional increase in back pain with extensive lifting and driving of the forklift (Tr. at 222). After participating in these activities, Plaintiff's pain reached a maximum of 7/10 (Tr. at 222). He completed a Oswestry Low Back Pain Questionnaire and made the following assessments: (1) "I can tolerate the pain I have without having to use pain medication"; (2) "I can take care of myself normally, without causing increased pain"; (3) "I can lift heavy weights, but it causes increased pain"; (4) "Pain prevents me from walking more than 1 mile"; (5) "I can only sit in my favorite chair as long as I like"; (6) "I can stand as long as I want, but it increases my pain"; (7) "Pain does not prevent me from sleeping well on my side"; (8) "My social life is normal, but it increases my level of pain"; (9) "I can travel anywhere, but it increases my pain"; (10) "My normal homemaking/job activities increase my pain, but I can still perform

all that is required of me" (Tr. at 223). Plaintiff's discharge summary read as follows:

> Richard Bean has been seen for a total of 9 visits. . . . Patient's treatment has consisted of completion of lumbar MedX protocol, cardiovascular walking, posture and stabilization exercises as well as body mechanic training for lifting activities. Patient's subjective report includes pain rating ranging from 2-7/10 with patient reporting 7/10 pain level after extensive work activities including lifting and especially driving forklift. Patient was recently reassessed over objective measures with results as follows:

| OSWESTRY PAIN QUESTIONNAIRE | 4/22/02 | 6/18/02 | DIFFERENCE |
|---|---|---|---|
| Perceived functional limitations | 26% | 12% | +53.8% improvement |

| STATIC LUMBAR MEDX | INITIAL | 6/3/02 | DIFFERENCE |
|---|---|---|---|
| Range of motion (degrees) | 0-51 degrees | 0-51 degrees | Some |
| Max force at 0 degrees (foot lbs) | 85 lbs | 187 lbs | +55% |
| Max force at 51 degrees (foot lbs) | 314 lbs | 362 lbs | +13% |

| BTE STATIC STRENGTH | 4/23/02 | 5/31/02 | DIFFERENCE |
|---|---|---|---|
| Quadriceps right | 77.8 lbs | 141.0 lbs | +80% |
| Quadriceps left | 85.2 lbs | 134.0 lbs | +56% |
| Hamstrings right | 59.8 lbs | 98.2 lbs | +64% |
| Hamstrings left | 55.6 lbs | 87.4 lbs | +57% |

| MOVEMENT LOSS | 4/23/02 | 6/18/02 | DIFFERENCE |
|---|---|---|---|
| Flexion | Major | Nil | Improvement |
| Extension | Major | Minimal | Improvement |
| Side gliding right | Minimal | Nil | Improvement |
| Side gliding left | Minimal | Nil | Improvement |

(Tr. at 230).

Plaintiff's pain level on June 20, 2002, was 2.5/10 (Tr. at 222). On June 25, 2002, Plaintiff noted pain at a level of 3/10 initially that increased to 4/10 with exercise, and stabilized at 3/10 post-treatment (Tr. at 222). On June 27, 2002, Plaintiff reported a high activity level at work the previous day and was experiencing a pain level of 3/10 (Tr. at

11

222). Plaintiff's pain level was 2/10 on July 1, 2002; he reported elevated pain over the weekend after working on his lawn mower (Tr. at 224). On July 3, 2002, Plaintiff rated his pain at 2/10 and stated he had improved in strength with continued pain with prolonged activities (Tr. at 225). On July 9, 2002, Plaintiff's pain level was 2/10 (Tr. at 225). He reported that his pain level increased on July 6, 2002, to approximately 6-7/10 for no apparent reason (Tr. at 225). On July 11, 2002, Plaintiff experienced pain at a level of 2/10; he told his therapist that he felt a slight increase in pain and stiffness in the first one to two hours after getting up in the morning (Tr. at 225).

On July 16, 2002, Plaintiff completed a Oswestry Low Back Pain Questionnaire. He rendered the following assessments: (1) "I can tolerate the pain I have without having to use pain medication"; (2) "I can take care of myself normally, but it increases my pain"; (3) "I can lift heavy weight, but it causes increased pain"; (4) "Pain prevents me from walking more than 1 mile"; (5) "I can only sit in my favorite chair as long as I like"; (6) "I can stand as long as I want, but it increases my pain"; (7) "Pain does not prevent me from sleeping well"; (8) "My social life is normal, but it increases my level of pain"; (9) "I can travel anywhere, but it increases my pain"; (10) "My normal homemaking/job activities increase my pain, but I can still perform all that is required of me" (Tr. at 229). Plaintiff's physical therapist formulated his discharge summary based both on the responses to the questionnaire and on Plaintiff's progress during this round of therapy:

> The patient enters rating 2/10 pain level to the low back. The patient reports increased pain to 5/10 over the weekend for no apparent reason. Treatment today was as follows: (1) Reassessment:

12

| LUMBAR MOVEMENT LOSS | 6/18/02 | 7/16/02 | DIFFERENCE |
|---|---|---|---|
| Flexion | Nil | Nil | Same, [WNL][6] |
| Extension | Minimal | Nil | Improvement, [WNL] |
| Right side glide | Nil | Nil | Same, [WNL] |
| Left side glide | Nil | Nil | Same, [WNL] |

| OSWESTRY PAIN QUESTIONNAIRE | 6/18/02 | 7/16/02 | DIFFERENCE |
|---|---|---|---|
| Perceived functional limitations | 12% | 16% | Decline |

| BTE STATIC STRENGTH | 4/23/02 | 7/16/02 | DIFFERENCE |
|---|---|---|---|
| Quadriceps right | 77.8 lbs | 115.0 lbs | +48% |
| Quadriceps left | 85.2 lbs | 143.0 lbs | +67% |
| Hamstrings right | 59.8 lbs | 104.0 lbs | +73% |
| Hamstrings left | 55.6 lbs | 98.1 lbs | +76% |

(2)  The patient received review of home exercise program as well as updated written program.  The patient shows right quadriceps strength deficit when compared to nondominant side with the patient exhibiting 19% less force on right.  Normally, the patient would exhibit approximately 10% greater strength on dominant side.  Actual deficit is approximately 29%.  The patient showed progress from 7/3/02 test where he exhibited 29% reduction when compared to left side with actual deficit at approximately 39%.  This may be due to the patient's subjective report including intermittent right anterior hip and groin pain.  The patient will be discharged to home exercise program at this time due to plateau of progress.

(Tr. at 226).

On June 25, 2002, Plaintiff returned to Dr. Ball (Tr. at 146).  He reported that his back pain was proportional to the amount of work he performed (Tr. at 146).

Examination revealed some tightness in the lumbar musculature, but no evidence of nerve deficit or weakness in the legs (Tr. at 146).  Straight leg raises were negative (Tr. at 146).

Dr. Ball noted that Plaintiff ambulated without any gross difficulty and that forward

---

[6]"Within normal limits."

13

bending was limited to approximately 70º (Tr. at 146). Plaintiff was ordered to continue his prescribed regimen (Tr. at 146).

Plaintiff was seen by Dr. Ball again on July 22, 2002 (Tr. at 146). He complained that he continued to have some stiffness in his low back and that his pain worsened with any activity such as bending or lifting (Tr. at 146). Plaintiff described his pain as being primarily located in the lumbosacral region and did not report any radiation (Tr. at 146). Physical examination revealed Plaintiff had pain to palpation of his lumbar spine through the paravertebral muscles and the spinus process (Tr. at 146). A CT scan was ordered in response to Plaintiff's continuing complaints of back pain (Tr. at 146).

A CT Scan of the lumbar spine was performed on July 24, 2002 (Tr. at 156). The scan revealed a "[c]entral-to-left paracentral protrusion of disk material at L5-S1 with slight inferior extrusion and partial calcification. Remainder of the spine normal" (Tr. at 156).

On July 29, 2002, Dr. Ball noted that Plaintiff had gone to the Emergency Room the previous weekend for treatment of his severe back pain (Tr. at 146). Examination revealed a paravertebral muscle spasm L1 through L5 (Tr. at 146). There was no evidence of nerve deficit into the lower extremities and deep tendon reflexes were symmetric bilaterally (Tr. at 146). An x-ray report revealed a protruding disk at the L5/S1 level (Tr. at 146). The physician ordered a neurological consult due to "the patient's progressing pain and abnormal CT scan" (Tr. at 146). Plaintiff was given a

Case 6:04-cv-03439-REL   Document 14   Filed 03/27/06   Page 14 of 59

prescription for one Darvocet N –100[7] every six hours as needed for pain (Tr. at 146).

Plaintiff was released from work through August 12, 2002, pending further evaluation

(Tr. at 146).

On August 27, 2002, Plaintiff presented to Dr. Strang for an initial assessment

(Tr. at 241-242).  He reported persistent low back pain that radiated into the right

inguinal[8] region (Tr. at 241).  Dr. Strang noted that there did not appear to be any

particular radicular distribution (Tr. at 241).  Plaintiff stated his symptoms worsened with

activity and were relieved somewhat with rest (Tr. at 241).  Current medications included

Darvocet and Prevacid[9] (Tr. at 241).  Examination of Plaintiff's extremities, bones, and

joints was unremarkable (Tr. at 241).  After examining his back Dr. Strang noted, "No

obvious abnormal curvature present.  No limitation in range of motion in the cervical or

lumbar spine.  The cervical and lumbar spine are without tenderness to palpation" (Tr. at

241).  Deep tendon reflexes were 2+ to 3+ and symmetrical (Tr. at 242).  Ankle jerks

were 2+ to 3+ bilaterally." (Tr. at 242).  Dr. Strang documented a clinical impression of

mechanical low back pain[10] and ordered an MRI (Tr. at 242).  Plaintiff was released from

work until September 3, 2002 (Tr. at 243, 246).

_____

[7]Darvocet N-100 is used to relieve pain.  Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d03434a1 (last visited Jan. 23, 2006).

[8]The inguinal region relates to the groin.  STEDMAN'S MEDICAL DICTIONARY 872.

[9]Prevacid decreases the amount of acid in the stomach.  Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d03828a1 (last visited Jan. 23, 2006).

[10]With mechanical low back pain, "the source of the pain may be in the spinal joints, discs, vertebrae or soft tissue."  Health Information Center, What You Need to Know About Acute Low and Mechanical Back Pain: Symptoms and Diagnosis, available at http://www.spineuniverse.com/displayarticle.php/article2026.html (last visited Feb. 10, 2006).

On August 30, 2002, an x-ray was taken of Plaintiff's lumbar spine. The x-ray revealed a mild degenerative disk narrowing at L5-S1 and a reduced degree of flexion (Tr. at 157).

On September 3, 2002, Plaintiff saw Dr. Strang for a follow-up appointment (Tr. at 244). He reported that his symptoms had not changed since the previous visit (Tr. at 244). Dr. Strang noted:

> His flexion/extension lumbar spine films show evidence of loss of disc space height at L5-S1, but no evidence of abnormal motion on flexion/extension. His MRI scan of the lumbar spine shows evidence of some degenerative changes with loss of signal on T2-weighted images. There are also some sclerotic endplate/modic changes at L5-S1.

(Tr. at 244). The physician told Plaintiff that, although he might have some discogenic etiology[11] for his back pain, he needed to lose weight for any treatment to be successful (Tr. at 244). Plaintiff agreed to try to lose weight and a return visit was scheduled for two months (Tr. at 244). Plaintiff was released to return to work with restrictions for no lifting over fifteen pounds and no bending or twisting at the waist (Tr. at 247).

A MRI report, dated September 3, 2002, revealed a "central disc protrusion at L5-S1 with slightly greater left component. No additional disc bulge of protrusion" (Tr. at 245).

A Radiological Report, dated November 2, 2002, found:

> No compression fracture and alignment is normal. On flexion and extension, no instability. There is mild anterior spurring at L4-L5 and L5-S1 and also at L3-L4. Only mild disc space narrowing at L5-S1. On the oblique views, no particular abnormality. Facet joints are normal. Mild degenerative disc disease at L4-L5

---

[11]"Discogenic etiology" describes "a disorder originating in or from an intervertebral disk." STEDMAN'S MEDICAL DICTIONARY 491.

16

and L5-S1 in particular.

(Tr. at 171-172).

Plaintiff returned to see Dr. Strang on November 5, 2002, reporting that he had lost five pounds over the previous two months, but that his back pain had not significantly changed (Tr. at 248). The need for weight loss was again discussed and Plaintiff was scheduled to return in three months (Tr. at 248).

On November 11, 2002, Plaintiff again began physical therapy for his increased leg pain. Therapy was resumed three times a week for one week and then two times a week for two weeks (Tr. at 233).

A November 25, 2002, lumbar spine series evidenced "mild degenerative disc disease at L4-L5 and L5-S1 in particular" (Tr. at 171-172). The films revealed no compression fracture and showed that Plaintiff's alignment was normal (Tr. at 171). Plaintiff had no instability on flexion and extension (Tr. at 171). There was "mild anterior spurring at L4-L5 and L5-S1 and also at L3-L4. Only mild disc space narrowing at L5-S1." (Tr. at 171).

On November 25, 2002, Plaintiff saw Dr. Boyd Crockett, M.D., upon referral by Dr. Strang (Tr. at 251). Plaintiff described a progressive pain that was a constant "achiness" in his low back with occasional sharp pains and numbness down into his left leg to his middle toes (Tr. at 251). He stated that the pain averaged 5/10, but at its worst was 10/10. (Tr. at 251). He related that the pain interfered with his vocational and leisurely activities, as well as with his sleep (Tr. at 251). Plaintiff reported that he had

17

previously tried Vioxx,[12] Ibuprofen, and Darvocet without relief, as well as physical therapy without benefit (Tr. at 251). He reported that his current medications were Equate pain reliever and Darvocet (Tr. at 251).

Physical examination revealed:

. . .

Gait, good swing and stance, somewhat antalgic.[13]

Musculoskeletal, full AROM in bilateral upper and lower extremities. Manual muscle testing is 5/5 throughout without focal deficits.

There are some lumbar paraspinal spasms. Otherwise, no atrophy or tenderness.

Neurologically, cranial nerves II-XII intact. Cognition is grossly intact.

Sensation intact to light touch and pinprick throughout. However, in the area below the knee and the area of the L4-5 and S1 dermatomes, there is decreased acuity to pinprick when compared to the right leg.

Deep tendon reflexes are symmetric. The left knee jerk is somewhat decreased when compared to the right. However, biceps, triceps, brachioradialis, hamstring jerk, and ankle jerks are symmetric at 2/4.

Neural tension tests all negative, including Spurling's maneuver, thoracic compression, sitting and lying straight leg raise, and femoral stretch.

Patient's anterosuperior iliac spine crests are symmetric. Negative rocker's, Gaenslen's, and FABER's maneuvers.

No evidence of leg length discrepancy.

Patient's spine with full flexion and limited extension. Extension and lateral rotation really exacerbate patient's pain, especially to the left.

---

[12]Vioxx is a nonsteroidal anti-inflamatory drug that "works by reducing substances that cause inflamation, pain, and fever in the body." Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d04433a1 (last visited Jan. 23, 2006).

[13]"Antalgic" is a synonym for "analgesic," which means "[c]haracterized by reduced response to painful stimuli." STEDMAN'S MEDICAL DICTIONARY 69.

18

(Tr. at 252-253).  Plaintiff was diagnosed with:

1.  Mechanical low back pain
2.  Exam consistent with some posterior element irritations, specifically facet arthropathy
3.  There were L5 radicular symptoms, including decreased sensation and mildly decreased knee jerk.

(Tr. at 253).  Dr. Crockett ordered physical therapy for traction and TENS,[14] a selective nerve root block, and prescribed Bextra[15] and Zanaflex[16] (Tr. at 253).  He discussed the need for Plaintiff to loose weight (Tr. at 253).  Plaintiff was given a release from work from November 25, 2002, until further notice (Tr. at 255).

On November 27, 2002, Plaintiff again entered a physical therapy regimen.  He stated that his previous therapy had improved his strength and flexibility but that he still experienced pain (Tr. at 234).  On December 3, 2002, Plaintiff stated that he had used a TENS eight hours a day for four days with no reduction in symptoms and, in fact, felt worse in the morning (Tr. at 236).  On December 4, 2002, he again reported increased symptoms in the morning (Tr. at 237).

On December 5, 2002, Plaintiff went to Ozarks Medical Center's Emergency Department, complaining of back pain that radiated from his left leg to the toes (Tr. at 160).  He reported that his pain constantly got worse after his automobile accident, but

---

[14]Transcutaneous electrical nerve stimulation.

[15]Bextra is a nonsteroidal anti-inflammatory drug that "works by reducing substances in the body that cause inflammation, pain, and fever."  Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d04778a1 (last visited Jan. 23, 2006).

[16]Zanaflex is a muscle relaxant that works by blocking nerve impulses or pain sensations that are sent to the brain.  Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d04433a1 (last visited Jan. 23, 2006).

19

that he had not sustained any new trauma since that time (Tr. at 160). Plaintiff was diagnosed with mechanical lower back pain, given a pain injection and was discharged with a prescription for Percocet[17] (Tr. at 165, 168).

On December 10, 2002, Plaintiff's physical therapist noted that he had completed four sessions without any subjective improvement and rated his pain at 7/10 (Tr. at 238). Because the therapy was not producing lasting benefit, Plaintiff's sessions were placed on hold until his physician instructed him to resume (Tr. at 238).

On December 11, 2002, Plaintiff underwent a selective nerve root block L5 for a diagnosis of lumbosacral radiculitis[18] (Tr. at 174-191). Physical examination revealed, "Tenderness to palpation of the lower lumbar spine. Straight leg was positive at approximately 40 degrees on the left. Deep tendon reflexes appeared equal bilateral. There did appear to be loss of sensation in the L5 dermatome to pinwheel examination and motor strength appeared adequate." (Tr. at 177). Plaintiff told Dr. Baker that his pain was constant and "shooting" when standing; the pain worsened with walking, getting up and down, and bending (Tr. at 176). Plaintiff obtained relief by laying down and states that "pain medication makes it tolerable" (Tr. at 176). He told Dr. Baker that the pain affected his sleep, concentration, social and personal relations, employment, emotions and his physical activity (Tr. at 176). Current medications included Zanaflex, Bextra, and a pain pill that Plaintiff believed to be Percocet (Tr. at 176).

---

[17]Percocet is used to relieve moderate to severe pain. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d03431a1 (last visited Jan. 23, 2006).

[18]Inflammation of the lumbar vertebrae and the sacrum. STEDMAN'S MEDICAL DICTIONARY 998, 1484.

Case 6:04-cv-03439-REL   Document 14   Filed 03/27/06   Page 20 of 59

On December 13, 2002, Plaintiff underwent a bone scan of the lumbar spine and pelvis (Tr. at 192-196). The findings of the scan were unremarkable (Tr. at 195).

On December 16, 2002, Plaintiff returned to physical therapy and reported a pain level of 6/10 (Tr. at 237). He stated that the December 11, 2002, injection did not produce any lasting benefit (Tr. at 237). Plaintiff was not able to do his exercises due to pain (Tr. at 237). Plaintiff saw his physical therapist again on December 19, 2002 (Tr. at 237). His pain level in the left leg/foot was 4/10, but he had been able to do his exercises the last couple days (Tr. at 237). On December 20, 2002, Plaintiff's physical therapist wrote:

> The patient has been seen for a total of six physical therapy visits, including his initial evaluation on 11/27/02. Current subjective reports include pain status at 4/10 with pain continuing into his leg and foot with numbness in his foot. Range of motion is reassessed as follows:

| ACTIVE MOVEMENT LOSS | 12/10/02 | 12/19/02 | DIFFERENCE |
|---|---|---|---|
| Lumbar flexion | Major | Minimal | Improvement |
| Lumbar extension | Minimal | Minimal | No difference |
| Side gliding right | Minimal | Minimal | No difference |
| Side gliding left | Minimal | Minimal | No difference |

> Treatment has consisted of HEP[19] for lumbar and lower extremity flexibility and lumbar pelvic traction with warm moist pack. There is no immediate change in symptoms with the exercises or the traction. Previous TENS trial was without benefit. To this date, physical therapy has not provided any relief of his subjective symptoms, although there has been a slight increase of lumbar range of motion. We find that the patient has plateaued. We plan to discharge the patient from therapy at this time pending any changes in your orders.

(Tr. at 239).

After receiving an epidural L5 injection and a course of physical therapy, Plaintiff

---

[19]Home exercise program.

returned to Dr. Crockett on December 23, 2002, and reported no improvement (Tr. at 256). He stated that he had actually had an increase in numbness of the left leg (Tr. at 256). During physical examination, Plaintiff exhibited a full active range of motion (Tr. at 256). Dr. Crockett noted that there possible trace weakness in the left extensor halluces longus[20] (Tr. at 256). A bone scan was normal (Tr. at 257). Lumbar spine films showed "some L4-5 and L5-S1 anterior spurring and also some evidence of L4-5 left radiculopathy" (Tr. at 257). Dr. Crockett diagnosed Plaintiff with mechanical low back pain (Tr. at 257). At Plaintiff's request, he was referred back to Dr. Strang (Tr. at 257). Plaintiff was encouraged to continue with his weight loss, instructed to continue taking Gabitril[21] and Bextra, and instructed to cease taking Zanaflex (Tr. at 257).

On January 14, 2003, Plaintiff told Dr. Strang that he had seen Dr. Crockett and had started physical therapy, as well as having been prescribed Bextra (Tr. at 249). Plaintiff stated that after taking Bextra for a few weeks, the increased pain in his left leg and sensory deficit subsided (Tr. at 249). He also reported that an epidural injection had not provided significant relief (Tr. at 249). It was noted that Plaintiff's weight loss had plateaued and that he was interested in a formal weight loss program (Tr. at 249). Examination revealed that Plaintiff's condition was unchanged (Tr. at 249).

Plaintiff again presented to Dr. Crockett on January 21, 2003 (Tr. at 258). He

---

[20]The extensor halluc[i]s logus is "a thin muscle, situated between the tibialis anterior and the extensor digitorum longus." WIKIPEDIA, Extensor Hallucis Logus Muscle, *available at* http://en.wikipedia.org/wiki/Extensor_hallucis_longus_muscle (last visited Feb. 10, 2006).

[21]Gabitril is used to control seizures and also for other purposes. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d04221a1;_ylt=Ak3PKozEDCoKS2fKE.Rn7xrxurcF (last visited Jan. 23, 2006).

22

reported that Dr. Strang had re-evaluated him and had not felt that he was a good surgical candidate and, therefore, referred him back to Dr. Crockett (Tr. at 258). Plaintiff stated that his left leg numbness was the same, but reported that his pain level and sleep were "much improved" with the Bextra and Gabitril (Tr. at 258). Plaintiff was diagnosed with mechanical low back pain and with having some evidence of lumbar radiculopathy in the L5 pattern (Tr. at 259). Sensory examination showed an L5- S1 focal deficit on the left (Tr. at 259). Dr. Crockett noted that Plaintiff's insurance company had denied his claim for Bextra and that he was unable to afford it (Tr. at 259). As a result, Dr. Crocket gave Plaintiff a prescription for Celebrex[22] 200 mgs and increased his Gabitril dosage to 6 mgs for seven days and then to 8 mgs at night (Tr. at 259). Plaintiff was also referred to a dietician for weight loss (Tr. at 259).

On March 18, 2003, Dr. Vikram Patney diagnosed Plaintiff with hypertension and chronic low back pain (Tr. at 262). Lab work was ordered and Plaintiff was instructed on weight loss and other hypertension control measures (Tr. at 262-263).

On April 2, 2003, Plaintiff saw Dr. Patney for a follow-up after his lab work (Tr. at 271). He was diagnosed with Type 2 diabetes, hypertension, metabolic syndrome with

---

[22]Celebrex is a nonsteroidal anti-inflammatory drug that "works by reducing substances that cause inflammation, pain, and fever in the body." Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d04380a1 (last visited Jan. 23, 2006).

5/5 criteria,[23] microalbuminuria,[24] and lymphocytosis[25] (Tr. at 271). Plaintiff was placed

on a 1,200 to 1,400 kilocalorie diet and instructed to attend a class on diabetes and to

exercise thirty minutes a day five times a week (Tr. at 271). He was prescribed Avapro[26]

for the microalbuminuria (Tr. at 271).

On April 14, 2003, Plaintiff was seen by Dr. Strang. He reported that he had been

diagnosed with diabetes, hypertension and hypercholesterolemia (Tr. at 250). Plaintiff

was encouraged to continue his weight loss and told if he does so, his back symptoms

would likely resolve (Tr. at 250).

Plaintiff presented for follow-up with Dr. Crockett on May 1, 2003 (Tr. at 260).

Dr. Crocket noted:

> He continues to be off work. He continues to be able to perform sedentary
> activity only. He tried to rake his garden in the yard for about two hours and
> basically had to stay in bed for the next two days due to such severe pain. Denies
> any focal weakness. He has lost a considerable amount of weight since his last
> visit in January, which patient is trying to do. He is also trying to stay active;
> however, he is unable to lift anything. He is trying to lose weight by a walking
> program and watching what he is eating. Pain and numbness are still in the same

---

[23]"The main features of metabolic syndrome include insulin resistance, hypertension (high blood pressure), cholesterol abnormalities, and an increased risk for clotting. Patients are most often overweight or obese." Ruchi Mathur, Metabolic Syndrome, *available at* http://www.medicinenet.com/metabolic_syndrome/article.htm (last visited Feb. 10, 2006).

[24]"Generally, a subtle increase in the urinary excretion of the protein albumin that cannot be detected by a conventional assay. In diabetes, microalbuminuria is an early sign of diabetic kidney disease." MedicineNet.com, Definition of Microalbuminuria, *available at* http://www.medterms.com/script/main/art.asp?articlekey=23540 (last visited Feb. 10, 2006).

[25]"Lymphocytosis" is "[a] form of actual or relative leukocytosis in which there is an increase in the number of lymphocytes." STEDMAN'S MEDICAL DICTIONARY 1009. "Leukocytosis" is "[a]n abnormally large number of leukoytes, as observed in acute infections." Id. at 959. "Leukoytes" is synomonymous with "white blood cells." Id. at 958.

[26]Avapro is used to treat hypertension. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d04222a1 (last visited Jan. 23, 2006).

area. Most of the pain is in his back, occasionally shooting down his leg. Patient was originally diagnosed with diabetes but he has yet to start any medications for that.

(Tr. at 260). Plaintiff was instructed to continue Gabitril and Celebrex (Tr. at 261). Dr. Crocket encouraged Plaintiff to lose more weight and recommended that if he had an exacerbation of pain or lost more weight that he should follow-up with Dr. Strang for possible surgical intervention (Tr. at 261). Plaintiff was released for sedentary activity only (Tr. at 261).

On May 2, 2003, Plaintiff had a follow-up appointment with Dr. Patney (Tr. at 276). He reported that his neurosurgeon told him to loose fifty pounds before surgery could be considered and, even then, it may not give adequate benefit (Tr. at 276). Dr. Patney noted that Plaintiff had lost nine pounds over the last few months (Tr. at 276). Plaintiff was started on Glucophage 500 mgs twice daily for diabetes (Tr. at 276). Additional lab work was ordered to further evaluate his lymphocytosis (Tr. at 276).

On May 12, 2003, Plaintiff was informed that he had chronic lymphotic leukemia (Tr. at 279, 289). Dr. Patney explained to him that this was a slow growing, relatively stable kind of leukemia that would eventually be fatal (Tr. at 279, 289). Plaintiff was scheduled for a bone marrow biopsy (Tr. at 279, 289). The biopsy was conducted on May 14, 2003, and confirmed chronic lymphocytic leukemia/well differentiated lymphoma (Tr. at 181).

On May 20, 2003, Plaintiff was seen by Dr. Patney for follow-up of his leukemia. Dr. Patney noted that Plaintiff's back pain was better, his blood pressure was controlled, and that he denied any depression (Tr. at 293). Plaintiff declined an offer of anti-

depressants (Tr. at 293).

Plaintiff saw Dr. Charles Morgan, M.D., on May 22, 2003 (Tr. at 297). Dr. Morgan noted that Plaintiff had chronic back pain from his injury, but that he also had some mild arthritic pain (Tr. at 297). He recommended exploring the possibility of a bone marrow transplant for Plaintiff's leukemia (Tr. at 298).

On June 13, 2003, Dr. Hanna Khoury, M.D., indicated that, after examining Plaintiff, his recommendation was that no intervention be ordered for the diagnosis of leukemia (Tr. at 284-85).

A Pathology Report, dated June 25, 2003, confirmed the diagnosis of leukemia (Tr. at 286-287).

Plaintiff saw Dr. Patney again on July 1, 2003, and reported that he had lost five pounds since the last visit (Tr. at 295). He stated that he was still not working, but that his back pain was much better (Tr. at 295). He had been walking on and off, but not regularly (Tr. at 295). Plaintiff was instructed to continue his medications as prescribed (Tr. at 295).

On August 4, 2003, Plaintiff reported a decrease in his energy level (Tr. at 299). On September 29, 2003, Plaintiff denied significant bone or joint pain, but did admit to some possible anxiety/depression (Tr. at 300). Dr. Morgan prescribed Paxil CR[27] 12.5 mgs daily (Tr. at 300).

On December 16, 2003, Plaintiff presented for follow-up of his back pain. He

---

[27]Paxil CR is used to treat depression and anxiety. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d03157a1 (last visited Jan. 23, 2006).

reported continuing pain with radiation into his legs (Tr. at 302).

In a Medical Source Statement-Physical, dated December 17, 2003, Dr. Ball documented that Plaintiff retained the physical capacity to (1) frequently lift and/or carry ten pounds, (2) occasionally lift and/or carry twenty-five pounds, (3) stand and/or walk a total of two hours in an eight-hour workday and continuously for one hour, (4) sit a total of three hours in an eight-hour workday and continuously for thirty minutes, and (5) perform limited pushing and/or pulling with his legs (Tr. at 303-304). Additionally, Plaintiff could frequently balance, occasionally kneel or crouch, and never climb, stoop, or crawl (Tr. at 304). He was also instructed to observe restrictions for vibration, heights, and hazards (Tr. at 304).

In a Medical Source Statement-Mental, Dr. Ball assessed that Plaintiff had a medically determined mental impairment that had lasted or was expected to last at least twelve months (Tr. at 305). He opined that Plaintiff was moderately limited in his ability to: (1) maintain attention and concentration for extended periods; (2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (3) and complete a normal workday and work week without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods (Tr. at 306).

On December 22, 2003, Plaintiff reported edema[28] of the hands and feet (Tr. at 301). He reported that his chronic back pain was stable (Tr. at 301). Dr. Morgan

---

[28]"Edema" is the "accumulation of an excessive amount of watery fluid in cells, tissues, or serous cavities," or swelling. STEDMAN'S MEDICAL DICTIONARY 544.

assessed Plaintiff's leukemia as stable (Tr. at 301).

On January 7, 2004, Jeff Farrow, Psy.D., completed a Medical Source Statement - Mental (Tr. at 308-310). Dr. Farrow's opinion covered the period from January 7, 2004, through January 7, 2004 (Tr. at 310). He assessed that Plaintiff was moderately limited in the ability to (1) remember locations and work-like procedures, (2) carry out very short and simple instructions, (3) make simpl[e] work-related decisions, (4) interact appropriately with the general public, (5) respond appropriately to changes in the work setting, (6) be aware of normal hazards and take appropriate precautions, and (7) set realistic goals or make plans independently of others (Tr. at 308-310). Dr. Farrow assessed that Plaintiff was markedly limited in his ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) sustain an ordinary routine without special supervision; (6) work in coordination with or proximity to others without being distracted by them; (7) complete a normal workday and work week without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods; (8) accept instructions and respond appropriately to criticism from supervisors; and (9) get along with coworkers or peers without distracting them or exhibiting behavioral extremes (Tr. at 308-310).

Dr. Farrow also completed a Disability Determination Evaluation (Tr. at 311-313). When asked about his history and current symptoms, Plaintiff reported:

I applied for disability in August. I was in a car wreck in March of 2002. It

28

messed up my back at S4 and S5 [sic]. They say I have a bulging disk and that my bottom disk is deteriorating. Pain shoots down my left leg. It was a lot worse before they started me on Celebrex and Gabitril. I am also taking Avapro for high blood pressure; [M]etformin for my diabetes; and Paxil for my depression. The medicine helps keep the pain down, but if I try to do too much, it hurts bad. The more I try to do the worse it does. The stupidest thing is sweeping the floor can be too much at times. I was walking about three-fourths of a mile to exercise before the pain got too much. We recently moved and I don't have a place to walk now. I have leukemia. I found out about that in June, maybe July. I found out about it at the same time I found out about my diabetes. I feel like my body is falling apart. Everything seems to be happening all at once. I think the diagnosis of leukemia hit me the hardest. I had an uncle die from that. I'd never been depressed before all this happened. Now, I'm having lots of problems dealing with things. I had been working at Bruce's Hardwood for 13 years. They wouldn't take me back when the doctors wouldn't remove my work restrictions. It was hard going from earning all the money to nothing. I don't feel like I can do much of nothing no more. When I got too depressed, Dr. Morgan put me on Paxil. It has helped some. I'm not as grumpy or short tempered as I have been.

(Tr. at 311).

Plaintiff also described continuing difficulties with depressive symptoms including depressed mood, decreased sleep, increased appetite, decreased energy, intermittent crying spells, being easily distracted, experiencing racing and ruminating thoughts, increased irritability, being withdrawn, feeling helpless, feeling hopeless, feeling restless, and feeling worthless "for a while" (Tr. at 311). He also reported experiencing symptoms of anhedonia,[29] having difficulties with his concentration and memory, and decreased sexual desire (Tr. at 311). Plaintiff did not have a history of suicidal behavior and denied any current suicidal or homicidal ideation, plans or intent (Tr. at 311).

Regarding Intellectual Functioning and Sensorium, Dr. Farrow wrote:

_____

[29]"Anhedonia" describes "[t]he absence of pleasure from the performance of acts that would ordinarily be pleasurable." STEDMAN'S MEDICAL DICTIONARY 90.

Mr. Bean was oriented to time, place, person and purpose. He knew today's date was January 7, 2004. He knew he was currently in West Plains, Missouri in Howell County. He knew the president was President Bush and that he was present today for a disability evaluation. Memory for immediate information was rated as fair in that he was able to repeat five digits forward and four digits backward. He evidenced intact remote memory functioning in that he could relate the events of his life in a logical, coherent and consistent fashion. Mr. Bean's functional memory would be rated as poor. He was able to remember zero-out-of-three items after a five-minute-time period. He could remember his date of birth and phone number. He had to look up his address. Mr. Bean's general fund of information was seen as being fair. He was able to list five large cities in the United States. He did not know the sun rises in the east, but knew water freezes at 32 degrees. He knew our last holiday was Christmas, but thought our next holiday will be Easter. Mr. Bean's sustained attention and concentration capabilities were assessed by asking him to subtract backward from 100 by serial 7s, which he was unable to do. He was then asked to subtract by serial 3s and was unable to complete this task. He was able to count backward from 20 to 1. He demonstrated difficulties in his concentration of two of these three tasks. He was able to solve several simple, single-digit, arithmetic problems in his head including addition, subtraction, multiplication and division. He was able to solve two-out-of-three simple mathematical problems employing money. Higher order abstract thinking capabilities were assessed through asking Mr. Bean to provide an explanation of several common proverbs. He was able to complete this task. Plaintiff was asked to identify similarities and differences between various objects; a task he performed at an adequate level. His judgment was assessed through hypothetical situations. He stated he would "Take it to the post office" if he found a stamped, addressed and sealed letter. He stated he would "Call the fire department" if he discovered a fire in a theater. Mr. Bean's overall intellectual functioning is believed to fall within the average range; although formalized intelligence testing was not conducted. His constructional abilities were tested by having him construct a clock and set the time at 3:30. He was able to complete this task adequately.

(Tr. at 312).

Plaintiff reported currently taking: Avapro, 150 mg once per day; Gabitril, 4 mg two

tablets at bedtime; Paxil, 12.5 mg once per day; Metformin, 500 mg once per day; and Celebrex,

200 mg once per day (Tr. at 312).

Dr. Farrow diagnosed Plaintiff with: (1) major depression, single episode, severe without

psychotic features; (2) diabetes, hypertension, leukemia, bulging discs, deteriorating discs (all

pursuant to client's report); (3) multiple health problems, financial problems, being unemployed,

and having a limited support system (Tr. at 312). He recorded that Plaintiff's current GAF[30] was

45 - 55, where it was 50 - 60 last year (Tr. at 312). Plaintiff was encouraged to contact the local

mental health clinic to enter into individual therapy or group therapy for his depressive symptoms

(Tr. at 313). Dr. Farrow also noted, "Plaintiff was open and honest in providing information for

today's mental status exam and disability evaluation. This opinion is based on the spontaneity of

his interactions . . . as well as the consistency of his reported history and symptoms" (Tr. at 313).

On January 16, 2004, Dr. Boyd D. Crockett completed a Medical Source Statement -

Physical (Tr. at 314-315). He documented Plaintiff's self-reported statements that he could (1)

frequently lift and/or carry up to ten pounds but no more, (2) occasionally lift and/or carry up to

ten pounds but no more, (3) stand and/or walk a maximum of forty-five minutes in an eight-hour

workday before needing a twenty-minute break, (4) sit a total of four hours in an eight-hour

workday if allowed a fifteen- to twenty-minute break every forty-five minutes to an hour, and (5)

perform limited pushing and/or pulling with his legs depending on the weight of the object (Tr. at

314-315). Additionally, Plaintiff could occasionally stoop, kneel or crouch; he could never

climb, balance, or crawl (Tr. at 315). He also reported having limited ability to reach, handle,

finger and feel, explaining that his right hand goes numb (Tr. at 315).

---

[30]The GAF is a 100-point tool rating overall psychological, social and occupational functioning of people over 18 years of age and older. It excludes physical and environmental impairment. A score ranging from 41 to 50 indicates serious symptoms or "serious impairment in one of the following: social, occupational, or school functioning," whereas a score of 51to 60 indicates moderate symptoms or "moderate difficulty in one of the following: social, occupational, or school functioning." Barbara L. Brown, *Global Assessment of Functioning (GAF) Scale (DSM - IV Axis V)*, *at* http://www.gpc.edu/~bbrown/psyc2621/ch3/gaf.htm (last visited Jan. 24, 2006).

### C. RESIDUAL PHYSICAL FUNCTIONAL CAPACITY ASSESSMENT

On November 19, 2002, Plaintiff underwent a physical residual functional capacity assessment[31] and the following findings were made:  Plaintiff could lift and/or carry fifteen pounds occasionally and ten pounds frequently; stand and/or walk a total of about six hours in an eight-hour workday; sit a total of about six hours in an eight-hour workday; push and/or pull on an unlimited basis; and occasionally climb, balance, stoop, kneel, crouch, or crawl (Tr. at 148-149).  The report advised that Plaintiff should avoid concentrated exposure to vibration and hazards (Tr. at 151).

Furthermore, the report noted: "Based on the total evidence of record this claimant is found to be partially credible.  He does have an impairment which could cause significant limitations, however they do not appear to be severe enough to prevent all work activity" (Tr. at 152).  The differences between these findings of Plaintiff's limitations and restrictions and those found by Dr. Strang as follows were explained as follows:  "On 9-3-02 Dr. Strang released claimant to lifting 15 lbs and no bending or twisting at the waist.  As there were no neurological problems, 'no bending or twisting' was not supported by the medical evidence, therefore this physician's opinion is given little weight" (Tr. at 153).

### D.  SUMMARY OF TESTIMONY

During the hearing, Plaintiff testified; Darrell Taylor, a vocational expert, also testified at

---

[31]The physical residual functional capacity assessment was marked as "Exhibit 2F" at the February 24, 2004, hearing.  According to Plaintiff's motion, "F" designates a medical record from a physician.  However the words "MEDICAL CONSULTANT'S SIGNATURE" are crossed out on the final page (Tr. at 154).  Plaintiff argues that there is no indication that the assessment was prepared by a physician and maintains that the document was probably misidentified as a "F" exhibit when it should have been diagnosed as an "E" exhibit.  Plaintiff, accordingly, concludes that the assessment was performed by a lay person.

the request of the ALJ.

### 1. Plaintiff's testimony

Plaintiff was thirty-eight years old on the date of the hearing, having been born on April 5, 1965 (Tr. at 35). Plaintiff testified that he lived in West Plains, Missouri, with his wife and five children, ages fourteen, twelve, ten, eight, and five (Tr. at 36). Although he has a valid driver's license, Plaintiff's wife drove him to the hearing (Tr. at 36). Plaintiff seldom drives as his back hurts after driving long distances (Tr. at 36). He is able to pick up his kids from school, however, and can drive around town (Tr. at 36).

Plaintiff testified that he graduated from high school, but did not have any additional education or training (Tr. at 36). He did not serve in the armed forces (Tr. at 37).

Plaintiff last worked as a forklift operator at Bruce Hardwood Floors (Tr. at 37). Plaintiff began working at Bruce Hardware in 1989, and stayed for thirteen years until he was forced to leave in July of 2002 due to back pain (Tr. at 37, 39). Plaintiff's job required lifting (Tr. at 37). Specifically, Plaintiff testified that he picked up and stacked lumber and serviced his 40,000 pound forklift (Tr. at 37). Plaintiff operated the forklift for three years; before that, he had operated a tilt machine for four years and also worked as a material handler for six years (Tr. at 37-39). Operating the tilt machine required Plaintiff to straighten lumber and make sure the correct lumber went to the ripsaws (Tr. at 38). Prior to working at Bruce Hardware, Plaintiff worked on his sister's dairy farm as a heavy equipment operator (Tr. at 39).

On October 24, 2001, Plaintiff was rear-ended in an automobile accident (Tr. at 40). He did not see a doctor, but instead tried to work with the other driver's insurance (Tr. at 39-40). When those dealings did not go well, Plaintiff decided to go to the doctor on his own (Tr. at 40).

33

He testified that he did not see a doctor initially because he thought the pain would go away (Tr. at 40). When Plaintiff did see a doctor, he did so due to his pain and not in furtherance of the pending lawsuit over the accident (Tr. at 55). Before he ultimately quit working, Plaintiff saw Dr. Ball who referred him to Dr. Strang and Dr. Crockett (Tr. at 40). At the time of the hearing, Plaintiff was still seeing Dr. Ball, but the other doctors had told him there was nothing else they could do for him (Tr. at 41). None of these doctors gave depositions in the automobile accident litigation (Tr. at 55).

Plaintiff testified that his wife works outside the home (Tr. at 54). His daily activities include getting their kids up and off to school (Tr. at 43). After the kids are gone, Plaintiff rests for approximately three hours on the couch because he has trouble sleeping at night (Tr. at 43, 56-57). When he gets up during the night, Plaintiff spends a couple of hours on the couch or in a chair before going back to bed (Tr. at 43, 57). Plaintiff also does some laundry and a few household chores during the day (Tr. at 43). He does most of the cooking and goes grocery shopping with his wife (Tr. at 44). He has gone to some of his fourteen-year-old son's basketball games (Tr. at 44). Plaintiff does not do any yard work (Tr. at 45). Before his accident, Plaintiff mowed his own yard and also his stepfather's yard (Tr. at 58). His wife and oldest son now take care of this task (Tr. at 58). Plaintiff does not have any trouble in caring for his personal needs, such as dressing himself, feeding himself, bathing, washing and combing his hair, and tying his shoes (Tr. at 53). He does not use any wraps, supports, or braces (Tr. at 53). Additionally, he does not use a cane or walker, but did use crutches when his leg went numb (Tr. at 53-54).

Plaintiff's hobbies are watching television and reading outdoor magazines such as Outdoor Life and Bass Master; he does not belong to any organizations or clubs that meet on a

regular basis (Tr. at 44-45, 52). Plaintiff testified that he used to go camping, fishing, and hunting (Tr. at 52). The last time he went fishing was approximately four or five months before the hearing when he fished from a boat at Bull Shoals Lake; he estimated he had done so "a couple times" (Tr. at 52-53). Prior to his back injury, Plaintiff had also enjoyed doing mechanical work on his vehicles (Tr. at 59). He discontinued this hobby because of his back pain and now pays someone to do this work (Tr. at 59-60).

Plaintiff has some friends and/or relatives that visit him at his home infrequently, but maintains more frequent contact with them by phone (Tr. at 45). He travels to visit his stepfather in Caulfield, Missouri, once every two or three weeks, and also occasionally visits his sister who also lives in West Plains, Missouri (Tr. at 45). Plaintiff's brother who lives in West Plains and sister who lives near Joplin, Missouri, visit him at his home (Tr. at 54). Other than traveling to Bull Shoals to visit his brother and to various locations for doctors appointments, Plaintiff has not taken any long trips (Tr. at 54). The doctor who treats Plaintiff's leukemia is in St. Louis, Missouri (Tr. at 54); he also sees a doctor in Springfield, Missouri (Tr. at 57). When Plaintiff's wife drives him to Springfield, they generally have to stop three times along the way so he can stretch and move around (Tr. at 57-58).

Plaintiff testified that he has been told he needed to lose weight (Tr. at 46). He has seen a dietician in the past, although not regularly (Tr. at 46). Plaintiff is supposed to walk, but does not have a regular routine for doing so (Tr. at 45-46). He was also told to watch his blood sugar levels and to try to adhere to a 1,500 calorie per day diet (Tr. at 46). Plaintiff's last blood work was good and he does not think he has any problems with his diabetes (Tr. at 46).

Plaintiff testified that back pain prevented him from being able to continue to work (Tr. at

35

47, 55). He said he was able to sit for fifteen to thirty minutes before needing to get up from pain, stand for thirty minutes, and lift ten to fifteen pounds (Tr. at 56). If he does the dishes, stands up for a while, or sweeps the floor for fifteen minutes, his back starts hurting (Tr. at 47). Dr. Crockett gave Plaintiff an epidural injection in his back for the pain, but it was not beneficial (Tr. at 47).

With regard to his current medications, Plaintiff testified that he had taken Gabitril and Celebrex for his back every night for over a year, Avapro for blood pressure, Glucophage for diabetes since April of the previous year, and Paxil for the past three months (Tr. at 41). He has occasional stomach problems from his medications, likely the Celebrex, and takes an over-the-counter medication for relief (Tr. at 42-43). When asked about the efficacy of his medications, Plaintiff reported that the Gabitril and Celebrex help to a certain extent (Tr. at 49). If he needs extra pain medication, Plaintiff takes Tylenol although it does not really help (Tr. at 49). The Paxil has helped "some" with his "grouchy and hateful" feelings (Tr. at 48). His Paxil dosage has never been increased (Tr. at 49, 50). Plaintiff does not take any sleeping medications (Tr. at 49).

Plaintiff testified that he saw Dr. Farrow at the West Plains Hospital on one occasion (Tr. at 50). Dr. Farrow did not refer him to a psychiatrist for medication and did not say anything about medication during his visit (Tr. at 50).

Plaintiff testified that Dr. Ball is a family physician (Tr. at 51).

After quitting work, Plaintiff sought treatment for his back pain once in the Emergency Room (Tr. at 51). No specific event precipitated the pain (Tr. At 51). Prior to going to the Emergency Room, Plaintiff tried to reduce the pain with ice and aspirin (Tr. At 51). However,

36

this did not work; his whole leg went numb and it felt like a hot iron had been stuck in his leg (Tr. at 51). Emergency Room doctors gave him a shot in the back to treat his pain (Tr. at 51).

Finally, Plaintiff testified that he was tired all the time but did not know if this was due to his leukemia (Tr. at 58-59). The combination of leukemia and his back problems causes him to be depressed and interferes with his ability to work (Tr. at 59).

### 2. Vocational expert testimony

Vocational expert Darrell Taylor testified at the request of the Administrative Law Judge. Dr. Taylor stated that Plaintiff's past relevant work was that of (1) a forklift operator, which was a medium semi-skilled position, (2) a mill worker and materials handler, which are medium semi-skilled positions, and (3) a livestock farmer, which is a heavy semi-skilled position (Tr. at 61-62). None of these skills are transferable to lighter work (Tr. at 62). The ALJ then asked whether Plaintiff could perform past relevant work, or other work, under the following hypotheticals.

The ALJ first hypothesized an individual of Plaintiff's age, education and work history (Tr. at 62). The hypothetical also assumed that such an individual was limited to lifting fifteen pounds occasionally and lesser amounts progressively more frequently, could alternate standing and siting in thirty-minute intervals, and that he or she should avoid repetitive twisting-type movements and bending and lifting from floor level (Tr. at 62). Dr. Taylor testified that such an individual could not perform any past work (Tr. at 62). However, there were approximately 2,000 hand packer positions and 2,500 assembler positions (all being unskilled light exertional work) in Missouri that he or she could perform (Tr. at 62-63).

Based on Dr. Taylor's answer to his first hypothetical, the ALJ next asked whether an

individual who could not sustain working eight hours a day, forty days a week, and missed more than three days a month at least seven months out of the year would be precluded from work as a hand packager or assembler (Tr. at 63). Dr. Taylor testified that they would be precluded from such work (Tr. at 63).

Third, the ALJ inquired whether a hypothetical individual with the same limitations as those set forth by Dr. Farrow[32] would be able to maintain competitive employment (Tr. at 63). Dr. Taylor testified that he could not (Tr. at 63).

Dr. Taylor was next questioned by an attorney (Tr. at 64). The attorney first described a hypothetical individual who had Plaintiff's same age, work history, vocational background, and educational background but who also had the physical limitations set forth in Dr. Ball's December 17, 2003, medical source statement[33] (Tr. at 64). He then asked whether such an individual could do any past relevant work (Tr. at 64). Dr. Taylor testified he could not and explained that "[t]he past relevant work was at the medium to heavy exertional level, but in

---

[32]Dr. Farrow assessed that Plaintiff was moderately limited in the ability to (1) remember locations and work-like procedures, (2) carry out very short and simple instructions, (3) make simpl[e] work-related decisions, (4) interact appropriately with the general public, (5) respond appropriately to changes in the work setting, (6) be aware of normal hazards and take appropriate precautions, and (7) set realistic goals or make plans independently (Tr. at 308-310). Dr. Farrow assessed that Plaintiff was markedly limited in his ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) sustain an ordinary routine without special supervision; (6) work in coordination with or proximity to others without being distracted by them; (7) complete a normal workday and work week without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods; (8) accept instructions and respond appropriately to criticism from supervisors; and (9) get along with coworkers or peers without distracting them or exhibiting behavioral extremes (Tr. at 308-310).

[33]Dr. Ball documented that Plaintiff retained the physical capacity to (1) frequently lift and/or carry ten pounds, (2) occasionally lift and/or carry twenty-five pounds, (3) stand and/or walk a total of two hours in an eight-hour workday and continuously for one hour, (4) sit a total of three hours in an eight-hour workday and continuously for thirty minutes, and (5) perform limited pushing and/or pulling with his legs (Tr. at 303-304). Additionally, Plaintiff could frequently balance, occasionally kneel or crouch, and never climb, stoop, or crawl (Tr. at 304). He should also observe restrictions for vibration, heights, and hazards (Tr. at 304).

addition the individual would not be able to maintain competitive employment because he would not be able to complete an eight-hour workday" (Tr. at 64).

Next, the attorney asked whether the hypothetical individual could perform any other work existing in the national economy (Tr. at 64). Dr. Taylor testified that he could not (Tr. at 64).

Finally, the attorney hypothesized an individual who had the same age, work history, vocational background as Plaintiff, but who also had the non-exertional impairments set forth in Dr. Ball's mental medical source statement[34] (Tr. at 64). Dr. Taylor stated that such an individual would be able to perform simple unskilled work (Tr. at 64-65).

### E. FINDINGS OF THE ALJ

On February 24, 2004, the ALJ issued an opinion finding that Plaintiff was not disabled at step three of the sequential analysis. The ALJ found at step one that Plaintiff had not worked since July 24, 2002, his alleged onset of disability (Tr. at 21). At step two, the ALJ found the medical evidence established that Plaintiff had "obesity, mild degenerative disc disease at L5-S1, hypertension, Type II diabetes mellitus and hyperlipidemia controlled by medication, asymptomatic chronic lymphocytic leukemia, and very recent onset major depression" (Tr. at 21). However, none of Plaintiff's impairments, or combination of his impairments, met or equaled the "severity requirements of any impairment listed in Appendix 1, Subpart P, Regulations No. 4" (Tr. at 21).

---

[34]In a Medical Source Statement-Mental, Dr. Ball assessed that Plaintiff had a medically determined mental impairment that had lasted or was expected to last at least twelve months (Tr. at 305). He opined that Plaintiff was moderately limited in his ability to: (1) maintain attention and concentration for extended periods; (2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (3) and complete a normal workday and work week without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods (Tr. at 306).

## V. SEVERITY OF IMPAIRMENT(S)

Plaintiff argues that the ALJ erred in failing to find that his impairments of the lumbar spine met or equaled the criteria of 20 C.F.R., part 404, subpart P, appendix 1, § 1.04A. In finding Plaintiff not disabled, the ALJ stated:

> Although the [plaintiff] has diagnosed degenerative disc disease and has had signs of radiculopathy, he does not have most of the signs typically associated with chronic, severe musculoskeletal pain such as muscle atrophy, persistent or frequently recurring muscle spasms, neurological deficits (motor sensory, or reflex loss) or other signs of nerve root impingement, significantly abnormal x-rays, or other diagnostic tests, positive straight leg raising inflammatory signs (heat, redness, swelling, etc.), or bowel or bladder dysfunction. The medical evidence establishes no inability to ambulate effectively or to perform fine and gross movements effectively on a sustained basis due to any underlying musculoskeletal impairment.

(Tr. at 20).

> Listing 1.04A provides:
>
> 1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture) resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A.     Evidence of the nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. pt. 404, subpt. P, app. 1 § 1.04A.

Review of the medical evidence in this case demonstrates that Plaintiff's impairments do not meet or equal that described in Listing § 1.04A. Although Plaintiff does have degenerative disc disease (Tr. at 156, 157, 171-172, 245), the record does not contain substantial evidence that he suffers from each of the four additional requirements set forth in subsection A. Specifically,

40

the record does not show that Plaintiff's pain was caused by a compromised nerve root. Dr. Ball's April 17, 2002, physical examination did not reveal any evidence of radiculopathy (Tr. at 145). On June 25, 2005, Dr. Ball did not find any evidence of nerve deficit or weakness in the legs (Tr. at 146). On August 27, 2002, Dr. Strang noted that there did not appear to be any particular radicular distribution (Tr. at 241). To the contrary, Plaintiff's doctors consistently diagnosed him with mechanical back pain (Tr. at 165, 168, 242, 253, 257, 259, 262).

Similarly, there is insufficient evidence to support a finding that the motion of Plaintiff's spine was limited. On April 17, 2002, Dr. Ball noted that Plaintiff's gait and station were normal (Tr. at 145). Plaintiff experienced loss of motion during physical examination on April 23, 2002 (Tr. at 199). Physical therapy helped improve both his range of motion (Tr. at 209, 230). On June 3, 2002, Plaintiff's physical therapist stated he had "strength above that of standard norms and demonstrate[d] good flexion to extension ratio" (Tr. at 220). Although he did continue to have limitations with regard to full range of motion, such limitations were attributed to his "size and anatomical limitations" rather than to nerve root compression (Tr. at 220). On June 25, 2002, Dr. Ball observed that Plaintiff ambulated without any gross difficulty and that forward bending was limited to approximately 70° (Tr. at 146). Dr. Strang's August 27, 2002, physical examination revealed no limitation in Plaintiff's range of motion in the cervical or lumbar spine (Tr. at 241). On November 2 and 25, 2002, Plaintiff did not have any instability on flexion or extension (Tr. at 171). Physical examination on November 25, 2002, revealed that Plaintiff's gait had "good swing and stance," that he exhibited a full active range of motion in his legs, and that his spine had full flexion (Tr. at 252-253). Plaintiff also exhibited a full active range of motion on December 23, 2002 (Tr. at 256).

With regard to the third requirement, although there is some evidence that Plaintiff exhibited decreased sensation at times, the record certainly also contains sufficient evidence to support the ALJ's contrary finding that Plaintiff does not have neurological deficits such as motor loss with sensory or reflex loss. On July 29, 2002, Dr. Ball stated that there was "no evidence of nerve deficit into the lower extremities and deep tendon reflexes were symmetric bilaterally" (Tr. at 146). On August 27, 2002, Plaintiff's deep tendon reflexes were symmetrical (Tr. at 242). On November 25, 2002, Plaintiff's sensation to light touch and pinprick was intact, although his left leg had decreased acuity to pinprick as compared to his right leg (Tr. at 252-253). His deep tendon reflexes were symmetric, although the knee jerk was mildly decreased (Tr. at 252-253). On December 11, 2002, Plaintiff did appear to have loss of sensation in the L5 dermatome, but motor strength appeared adequate (Tr. at 177).

In addition, the record does not contain any evidence of that Plaintiff suffers from atrophy accompanied by muscle weakness. On April 17, 2002, Plaintiff did not have any muscle atrophy or sensory deficit in his legs (Tr. at 145). Dr. Ball did not detect any signs of muscle atrophy again on May 20, 2002 (Tr. at 145). On June 25, 2002, Dr. Ball did not find any evidence of nerve deficit or weakness in the legs (Tr. at 146). A November 25, 2002, physical examination revealed that despite some lumbar paraspinal spasms, Plaintiff did not exhibit any atrophy or tenderness (Tr. at 252-253). Dr. Crockett noted possible trace weakness in the left extensor hallucis longus on December 23, 2002, but did not mention any accompanying atrophy as required by Listing § 1.04A (Tr. at 21). Plaintiff denied any focal weakness on May 1, 2003 (Tr. at 260).

Finally, the majority of entries in Plaintiff's medical records state that Plaintiff had

42

negative straight leg raises. Specifically, he had bilateral negative straight leg raises on April 17, 2002, May 20, 2002, June 25, 2002, November 25, 2002 (Tr. at 145, 146, 252-253). Although Dr. Baker noted positive straight leg raises on December 11, 2002, he did not specify whether the positive results were in both the sitting and supine positions as required by Listing § 1.04A (Tr. at 177). Because Plaintiff does not have all the symptoms necessary to be disabled by a disorder of the spine, the ALJ did not err in finding Plaintiff's impairments did not met those described in Listing § 1.04A.

Plaintiff alternatively argues that even if his impairments do not meet the criterion of Listing § 1.04A, his impairments at least equal the listing. Plaintiff contends that the ALJ failed to consider his obesity as it affected his other impairments, and that the combination of all such impairments equal Listing § 1.04A.

Impairments are "medically equivalent to a listed impairment . . . if the medical findings are at least equal in severity and duration to the listed findings." 20 C.F.R. § 404.1526(a). Subjective complaints alone are not sufficient to establish medical equivalency, but must be given weight when corroborated by clinical or laboratory evaluations. 20 C.F.R. § 404.1528. Listing § 1.04Q provides further guidance on the effects obesity can have on the musculoskeletal system:

> Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of

obesity.

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00Q.

In support of his argument, Plaintiff cites <u>Roberts v. Barnhart</u>, 283 F. Supp. 2d 1058 (S.D. Iowa 2003), in which the court held that the ALJ erred in finding the combination of claimant's obesity and other impairments did not meet or equal a listed impairment. There, the claimant suffered from "morbid obesity"; physicians repeatedly noted that her obesity significantly contributed to her pain. <u>Id</u>. at 1060, 1061. One physician specifically noted that the claimant was "limited by obesity in regard to standing, moving about, walking, or sitting during an eight hour day," was "unable to stoop, climb, kneel, or crawl very well because of being overweight," and concluded that her problems were "interrelated in that her obesity result[ed] in her not being able to bend over or lift much and if she does, she has back pain upper and lower which is her myofascial pain[;] [h]er obesity makes her more prone to depression and she has low self-esteem." <u>Id</u>. at 1061. Another physician wrote she had an "'extremely strong body odor' and that 'she actually urinated in our chair'"; he also opined the claimant "would not interact appropriately with others in the work place." <u>Id</u>. at 1067. Not one of the claimant's physician offered evidence that she was able to work. <u>Id</u>.

The effects of Plaintiff's obesity in combination with his other impairments in this case stand in marked contrast to those of the claimant in <u>Roberts</u> and do not meet the standard for medical equivalence as set forth in the regulations. Here, on March 21, 2003, Plaintiff was 5' 9" tall and weighed 302 pounds, which calculates to a Body Mass Index ("BMI") of 44.6 (Tr. at 270). According to Social Security Ruling 02-1P, a BMI greater than or equal to 40 is classified as "extreme" obesity. Plaintiff's physicians were cognizant of his obesity and recommended on

44

several occasions that he loose weight (Tr. at 244, 248, 250, 253, 261-263, 276). Despite this knowledge, however, they did not impose restrictions that would have prevented him from being able to work in some capacity. Furthermore, Plaintiff was referred to a dietician only after indicating, on his own initiative, that he was interested in a formal weight loss program (Tr. at 249). He later testified that he did not see the dietician regularly, though, and that he did not have a regular routine of walking for exercise as recommended (Tr. at 45-46).

In finding that Plaintiff did not have a combination of listing-level impairments, the ALJ acknowledged that "[t]he medical evidence establishes that [Plaintiff] has <u>obesity</u>, mild degenerative disc disease at L5-S1, hypertension, Type II diabetes mellitus and hyperlipidemia controlled by medication, asymptomatic chronic lymphocytic leukemia, and very recent onset major depression" (Tr. at 21)(emphasis added). The medical evidence discussed above supports this finding. As a result, Plaintiff's motion for summary judgment on this basis is denied.

## VI. OPINIONS OF TREATING PHYSICIAN

Plaintiff argues that the ALJ erred in failing to give controlling weight to the opinions of his treating physician, Dr. Ball, and to the limitations imposed by Dr. Farrow concerning Plaintiff's mental impairments. Each argument will be addressed in turn.

First, the ALJ gave "little weight to the assessment by Dr. Ball on December 17, 2003." He noted that Dr. Ball's opinion was not supported by the medical evidence of record or by Dr. Ball's own treatment notes; he also assigned less weight to Dr. Ball's opinion because he was not a specialist in orthopedics, neurology, or psychiatry (Tr. at 19). The ALJ, instead, gave more "more weight" to the opinion of Dr. Strang. Plaintiff maintains this was erroneous as "there is a plethora of substantial evidence . . . clearly supporting Dr. Ball's restrictions and limitations."

45

The opinions of a treating physician are generally entitled to substantial weight. Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986). However, more weight may be given to "the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F. R. §§ 404.1527(d)(5) (regarding disability insurance benefits) and 416.927(d)(5) (regarding supplemental security income benefits); see also Kelley, 133 F.3d at 589 (citing Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995)).

Here, the record demonstrates that Plaintiff was seen by Dr. Ball on five occasions between April 17, 2002, and July 29, 2002. Dr. Ball is a family physician (Tr. at 51). Until Plaintiff's final appointment, Dr. Ball did not place any restrictions on Plaintiff; on July 29, 2002, however, he released Plaintiff from work through August 12, 2002, pending further evaluation (Tr. at 146). He also referred Plaintiff to Dr. Strang for a neurological consultation during this last visit (Tr. at 146). Dr. Ball did not complete the Medical Source Statement until December 17, 2003, almost one year and five months after having last seen Plaintiff (Tr. at 303-304).

Following Dr. Ball's referral, Plaintiff was seen by Dr. Strang five separate times between August 27, 2002, and April 14, 2003. On September 3, 2002, Dr. Strang authorized Plaintiff to return to work with restrictions for no lifting over fifteen pounds and no bending or twisting at the waist (Tr. at 247). He did not modify or otherwise alter these restrictions at any time over the course of Plaintiff's three subsequent appointments.

The ALJ did not err by discrediting Dr. Ball's opinion and giving more weight to that of Dr. Strang. As stated above, an ALJ may give more weight to the opinion of a specialist in his or

her area of expertise. Dr. Ball is a family physician who referred Plaintiff to Dr. Strang for a

neurological consultation, presumably due to Dr. Strang's expertise in that area. The restrictions

Dr. Strang placed on Plaintiff dealt directly with and pertained to the symptoms for which his

opinion was sought. As a result, the ALJ properly afforded more weight to the opinions of Dr.

Strang, the specialist, rather than to those of Dr. Ball, the family physician.

Second, Plaintiff contends that the ALJ erred in failing to give weight to the Medical

Source Statement - Mental completed by Dr. Farrow. Dr. Farrow only saw Plaintiff on one

occasion, January 7, 2004 (Tr. at 50). He report only covered the period of time from January 7,

2004, through January 7, 2004 (Tr. at 310). The opinion rendered following an "one-time

evaluation of a non-treating psychologist is not entitled to controlling weight." Clark v. Apfel,

141 F.3d 1253, 1256 (8th Cir. 1998)(citing Loving v. Dep't of Health & Human Servs., 16 F.3d

967, 971 (8th Cir. 1994)); see also Kelley, 133 F.3d at 589; Hancock v. Dep't of Health, Educ. &

Welfare, 603 F.2d 739, 740 (8th Cir. 1979). Moreover, there is no indication that Plaintiff's

depression is not effectively controlled by medication. The ALJ, therefore, properly discredited

Dr. Farrow's opinion.

### VII. RESIDUAL FUNCTIONAL CAPACITY

The ALJ stated that he could find

> no persuasive medical reason why [Plaintiff] could not perform jobs not requiring
> lifting more than about 10 pounds frequently or more than 15 pounds
> occasionally, or repetitive twisting, pushing, pulling and bending from floor level.
> He should be allowed to alternate sitting and standing about once every 30
> minutes.

(Tr. at 18). Plaintiff argues that the ALJ erred in failing to specifically reference the medical

evidence upon which he relied to determine his residual functional capacity. He also contends

that because the lifting limitations imposed on Plaintiff by the ALJ exactly mirror those contained in the Physical Residual Functional Capacity Assessment prepared by a lay person, the ALJ relied on that report without saying so. The medical evidence as contained in the record does not support Plaintiff's argument.

In determining a claimant's residual functional capacity, an ALJ must rely on "all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." McKinney v. Apfel, 228 F.3d 860, 868 (8th Cir. 2000)(citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)); see also Dykes v. Apfel, 223 F.3d 865, 866-67 (8th Cir. 2000)(citing 20 C.F.R. § 404.1545; Social Security Ruling 96-8p, at 8-9). Here, both the medical evidence and Plaintiff's own testimony support the ALJ's determination. On September 3, 2002, Dr. Strang released Plaintiff to return to work with the following limitations: "no lifting over 15 lbs, no bending, no twisting at waist" (Tr. at 247). Similarly, Plaintiff testified at the hearing that he could sit for fifteen to thirty minutes without pain, stand for thirty minutes, and lift ten to fifteen pounds. I conclude, therefore, that the ALJ's determination of Plaintiff's residual functional capacity is supported by substantial evidence.

## VIII. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that Plaintiff's testimony was not credible.

### A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.

1984).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions.  Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit Plaintiff's subjective complaints is supported by substantial evidence.  Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ.  In determining credibility, consideration must be given to all relevant factors, including a plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.  Polaski, 739 at 1322.

The specific reasons for discrediting Plaintiff's subjective complaints are as follows:

### 1.  PRIOR WORK RECORD

As noted by the ALJ, Plaintiff had an excellent work record up to and including his alleged onset of disability.  His highest annual earnings occurred in 2001 when he made $25,846.59.  Plaintiff's average annual earnings for the nineteen years he worked is $14,997.61. Therefore, this factor does not support the ALJ's determination.

### 2.  DAILY ACTIVITIES

At the hearing, Plaintiff testified that he was able to sit for fifteen to thirty minutes, stand

for thirty minutes, and lift ten to fifteen pounds (Tr. at 56). His daily activities included getting

his five children up and ready for school (Tr. at 43). He was also able to do laundry and other

household chores (Tr. at 43). Plaintiff stated that he did most of the cooking and went grocery

shopping with his wife (Tr. at 44). He is able to drive around town and travels short distances to

visit family (Tr. at 45). He has attended some of his son's basketball games (Tr. at 44) and went

fishing "a couple of times" approximately four or five months prior to the hearing (Tr. at 52-53).

Plaintiff further testified that he was unable to do yard work (Tr. at 45). He was able, however,

to care for personal needs such as dressing himself, feeding himself, bathing, washing and

combing his hair, and tying his shoes. Plaintiff does not wear wraps, supports or braces, or use a

cane or walker (Tr. at 53). His responses to the Oswestry Low Back Pain Questionnaires

consistently read, "My normal homemaking/job activities increase my pain, but I can still

perform all that is required of me" (Tr. at 197, 210, 223, 229).

Field Office Claim Representative Matthew Fuller noted that Plaintiff had difficulty

standing and walking and that, after sitting the length of the interview, stood slowly and walked

in a hunched position (Tr. at 102). On April 17, 2002, Dr. Ball noted Plaintiff initially had

difficulty walking after getting off the treatment table (Tr. at 145). Plaintiff told Dr. Baker on

December 11, 2002, that the pain affected his sleep, concentration, social and personal relations,

employment, emotions and physical activity (Tr. at 176).

In discrediting Plaintiff's complaints, the ALJ found that Plaintiff's daily activities were

restricted "mainly by his choice rather than by any apparent medical proscription." The record

amply demonstrates that Plaintiff remains able to perform many of his daily activities. His

responses to the Oswestry Low Back Pain Questionnaires consistently stated he was able to

perform all that was required of him at home and on the job.  As a result, this factor supports the ALJ's credibility determination.

### 3.  DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

On April 17, 2002, Plaintiff told Dr. Ball that his low back pain had progressively worsened since his October 24, 2001, automobile accident (Tr. at 145).  On April 23, 2002, Plaintiff reported back pain and "very bad leg pain" (Tr. at 198).  From April 23, 2002, until May 9, 2002, Plaintiff's complaints of pain ranged from two to three on a ten point scale (Tr. at 201-206).  Plaintiff reported a reduction in symptoms on April 29, 2002, due to reduced activities over the weekend (Tr. at 201).  On May 1, 2002, he stated he had experienced intermittent radicular pain with different work-related tasks (Tr. at 205).  On May 15, 2002, Plaintiff voiced continued increased back pain with heaving lifting activities at work that worsened as the day progressed (Tr. at 206).  From May 21, 2002, until June 18, 2002, Plaintiff's complaints of pain ranged from zero to four on a ten point scale (Tr. at 213-222).  From June 20, 2002, until July 11, 2002, Plaintiff's pain ranged from two to three out of ten, with the exception of July 6, 2002, when it was approximately six or seven for no apparent reason (Tr. at 225).  On July 29, 2002, Dr. Ball noted Plaintiff had gone to the Emergency Room the previous weekend for severe back pain (Tr. at 146).

On August 27, 2002, Plaintiff reported persistent low back pain that radiated into the right inguinal region (Tr. at 241).  He stated that his back pain had not significantly changed on November 5, 2002 (Tr. at 248).  By November 25, 2002, Plaintiff described his pain as progressive and as a constant "achiness" in his lower back with occasional sharp pains and numbness down his left leg to his middle toes (Tr. at 251).  He further stated that the pain

51

averaged five on a scale of ten, but at its worst was ten out of ten; the pain interfered with Plaintiff's vocational and leisurely activities, as well as with his sleep (Tr. at 251).

Plaintiff returned to physical therapy on December 16, 2002, and reported a pain level of six on a ten-point scale (Tr. at 237). By January 14, 2003, the increased pain in his left leg had subsided (Tr. at 249). On January 21, 2003, Plaintiff's pain was "much better" after taking Bextra and Gabitril (Tr. at 258). Plaintiff reported that his back pain was much better on July 1, 2003 (Tr. at 295). He denied significant bone or joint pain on September 29, 2003 (Tr. at 300). On December 22, 2003, Plaintiff described his back pain as stable (Tr. at 301). The record supports the ALJ's finding that Plaintiff's subjective complaints regarding the duration, frequency, and intensity of his symptoms. Although Plaintiff testified that pain prevented him from being able to work, his medical records to not reflect this same level of debilitating pain. Initially, Plaintiff consistently rated his pain at a two or three on a ten-point scale, and never higher than a four. Although he reported an increased pain level in November and December of 2002 (rating his pain at five or six on a ten-point scale), his pain was "much better" by January 21, 2003, and seems to have remained at that level. This factor, therefore, supports the ALJ's credibility determination.

### 4. PRECIPITATING AND AGGRAVATING FACTORS

Plaintiff's responses to his April 22, 2002, May 15, 2002, June 18, 2002, and July 16, 2002, Oswestry Low Back Pain Questionnaires stated that lifting heavy weights caused increased pain and that his pain prevented him from walking one mile or sitting for more than one hour (Tr. at 197, 210, 222, 229). He also stated that he could stand as long as he wished, but it also increased his pain (Tr. at 197, 210, 222, 229). Plaintiff indicated, "My normal homemaking/job

52

activities increase my pain, but I can still perform all that is required of me" (Tr. at 197, 210, 223, 229). Pain did not prevent him from sleeping well (Tr. at 223, 229).

On May 20, 2002, Plaintiff reported that his back pain was exacerbated by extended standing, forward bending, or lifting (Tr. at 145). On May 31, 2002, Plaintiff experienced a pain level of four on a ten-point scale and attributed the pain to work activities as the symptoms occurred near the end of the work day on May 20, 2002 (Tr. at 213). Again on June 3, 2002, Plaintiff reported increased symptoms with prolonged bending or lifting activities at work (Tr. at 217). On June 11, 2002, Plaintiff rated his pain at zero on a ten-point scale, but stated his pain was exacerbated over the weekend by activity (Tr. at 217). On June 13, 2002, he reported a 2.5 pain level and attributed his increased pain to extensive lifting and driving the fork lift at work (Tr. at 217).

By June 18, 2002, Plaintiff reported a generally improved tolerance to work activities with an occasional increase in back pain with extensive lifting and driving of the forklift; after performing these activities his pain reached a maximum of seven on a ten-point scale (Tr. at 222). Plaintiff told Dr. Ball on June 25, 2002, that his back pain was proportional to the amount of work he performed (Tr. at 146). On June 27, 2002, Plaintiff reported a high activity level at work the previous day and was experiencing a pain level of three out of ten (Tr. at 222). Again on July 1, 2002, he reported elevated pain over the weekend after working on his lawn mower (Tr. at 224).

On July 22, 2002, Plaintiff complained that he continued to have some stiffness in his low back and that his pain worsened with any activity such as bending or lifting (Tr. at 146). Plaintiff advised Dr. Strang on August 27, 2002, that his symptoms worsened with activity and were

53

relieved somewhat with rest (Tr. at 241). On December 11, 2002, Plaintiff told Dr. Backer that his pain was constant and "shooting" when standing; the pain worsened with walking, getting up and down, and bending (Tr. at 176). On May 1, 2003, Dr. Crockett noted that Plaintiff had to stay in bed due to severe pain for two days after trying to rake his garden for two hours (Tr. at 260). Plaintiff told Dr. Farrow on January 7, 2004, that sweeping the floor and walking three-fourths of a mile created a lot of pain (Tr. at 311).

The record does show that Plaintiff's pain was aggravated by activity. However, even when the symptoms worsened, Plaintiff assessed his pain at relatively low levels. Plaintiff also indicated throughout the course of his treatment, via the Oswestry Low Back Pain Questionnaire, that he could still perform those activities required of him despite the pain and that he could manage his pain without medication. As a result, the factors that aggravated Plaintiff's pain did not prevent him from working altogether. This factor supports the ALJ's finding.

### 5. DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

Plaintiff's responses to his April 22, 2002, May 15, 2002, June 18, 2002, and July 16, 2002, Oswestry Low Back Pain Questionnaires stated that he could manage his pain without medication (Tr. at 197, 210, 222, 229). On May 20, 2002, Plaintiff was prescribed 800 mgs of Ibuprofen and Prevacid to prevent stomach upset (Tr. at 145). He was given a prescription for one Darvocet every six hours as needed for pain, on July 29, 2002 (Tr. at 146).

On November 25, 2002, Plaintiff advised Dr. Crockett that he had previously tried Vioxx, Ibuprofen and Darvocet without relief (Tr. at 251); his current medications were Equate pain reliever and Darvocet (Tr. at 251). Dr. Crockett ordered TENS, a selective nerve root block and prescribed Bextra and Zanaflex (Tr. at 253). On December 3, 2002, Plaintiff reported that he had

54

used a TENS eight hours a day for four days with no reduction in symptoms and, in fact, felt worse in the morning (Tr. At 236). On December 5, 2002, Plaintiff was given a pain injection and prescribed Percocet (Tr. at 165, 168). Plaintiff told Dr. Baker on December 11, 2002, that medication made his pain tolerable (Tr. at 176). On December 16, 2002, Plaintiff reported that the pain injection did not produce any lasting benefit (Tr. at 237, 249).

On January 14, 2003, Plaintiff stated that after taking Bextra for a few weeks, the increased pain in his left leg and sensory deficit subsided (Tr. at 249). Again on January 21, 2003, Plaintiff reported his pain level and sleep were "much improved" with Bextra and Gabitril (Tr. at 258). When Plaintiff's insurance company later denied his claim for Bextra, Dr. Crockett prescribed Celebrex 200 mgs and increased Plaintiff's dosage of Gabitril to 6mgs for seven days and then 8 mgs at night (Tr. at 259).

On May 20, 2003, Plaintiff declined an offer for anti-depressants (Tr. at 297); however, he was given a prescription for Paxil, 12.5 mgs daily, on August 4, 2003 (Tr. at 300). Plaintiff reported that the Paxil has "helped some," and that he was not "as grumpy or short tempered" as he had been (Tr. at 311).

On January 7, 2004, Plaintiff's current medications included: Avapro, 150 mg once per day; Gabitril 4 mg, two tablets at bedtime; Paxil, 12.5 mg once per day; Metformin, 500 mg once per day; and Celebrex, 200 mg once per day (Tr. at 312). He told Dr. Farrow that his medications helped reduce his pain, but that he still felt pain when he tried "to do too much" (Tr. at 311).

The substantial evidence establishes Plaintiff's medications worked well. As noted by the ALJ, Plaintiff's pain was treated by means other than strong pain medications at various

Case 6:04-cv-03439-REL   Document 14   Filed 03/27/06   Page 55 of 59

times. Plaintiff responses to each of the four Oswestry Low Back Pain Questionnaires stated that he could manage his pain without medication. When strong pains medications were prescribed, however, the record does not indicate that they were ineffective. To the contrary, Plaintiff told doctors on multiple occasions that the medications were beneficial in managing his pain. The only negative side effect of these medications was an upset stomach, which Plaintiff controlled with Prevacid. This factor supports the credibility determination.

### 6. FUNCTIONAL RESTRICTIONS

On July 29, 2002, Dr. Ball released Plaintiff from work through August 12, 2002, pending further evaluation (Tr. at 146). Plaintiff was evaluated by Dr. Strang on August 27, 2002, and was, again, released from work until September 3, 2002 (Tr. at 243-246). When reevaluated on September 3, 2002, Plaintiff was released to return to work with restrictions for no lifting over fifteen pounds and no bending or twisting at the waist (Tr. at 247).

On November 25, 2002, Dr. Crockett gave Plaintiff a release from work until further notice (Tr. at 255). Following a May 1, 2003, examination, Dr. Crockett released Plaintiff for sedentary[35] activity only (Tr. at 260).

On December 17, 2003, Dr. Ball opined that Plaintiff retained the physical capacity to (1) frequently lift and/or carry ten pounds, (2) occasionally lift and/or carry twenty-five pounds, (3) stand and/or walk a total of two hours in an eight-hour workday and continuously for one hour, (4) sit a total of three hours in an eight-hour workday and continuously for thirty minutes, and (5)

---

[35]"Sedentary work involves lifting or carrying no more than 10 pounds at a time and occasionally lifting or carrying articles such as docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a) and 416.967(a). "Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a) and 416.967(a).

perform limited pushing and/or pulling with his legs (Tr. at 303-304). Additionally, Plaintiff could frequently balance, occasionally kneel or crouch, and never climb, stoop, or crawl (Tr. at 304). He was instructed to observe restrictions for vibration, heights, and hazards (Tr. at 304).

In addition, Dr. Ball opined that Plaintiff had a medically determined mental impairment that moderately limited in his ability to: (1) maintain attention and concentration for extended periods; (2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (3) and complete a normal workday and work week without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods (Tr. at 306).

On January 7, 2004, Dr. Farrow assessed Plaintiff and determined Plaintiff was moderately limited in the ability to (1) remember locations and work-like procedures, (2) carry out very short and simple instructions, (3) make simpl[e] work-related decisions, (4) interact appropriately with the general public, (5) respond appropriately to changes in the work setting, (6) be aware of normal hazards and take appropriate precautions, and (7) set realistic goals or make plans independently of others (Tr. at 308-310). Dr. Farrow assessed that Plaintiff was markedly limited in his ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) sustain an ordinary routine without special supervision; (6) work in coordination with or proximity to others without being distracted by them; (7) complete a normal workday and work week without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods; (8)

accept instructions and respond appropriately to criticism from supervisors; and (9) get along with coworkers or peers without distracting them or exhibiting behavioral extremes (Tr. at 308-310).

Lastly, on January 16, 2004, Dr. Crockett documented Plaintiff's self-reported statements that he could (1) frequently lift and/or carry up to ten pounds but no more, (2) occasionally lift and/or carry up to ten pounds but no more, (3) stand and/or walk a maximum of forty-five minutes in an eight-hour workday before needing a twenty-minute break, (4) sit a total of four hours in an eight-hour workday if allowed a fifteen- to twenty-minute break every forty-five minutes to an hour, and (5) perform limited pushing and/or pulling with his legs depending on the weight of the object (Tr. at 314-315). Additionally, Plaintiff could occasionally stoop, kneel or crouch; he could never climb, balance, or crawl (Tr. at 315). He also reported having limited ability to reach, handle, finger and feel, explaining that his right hand goes numb (Tr. at 315).

The restrictions placed on Plaintiff by his various doctors do not warrant the restrictions under which Plaintiff operated. As set forth in Part VI above, the opinions of Dr. Farrow do not constitute substantial evidence of Plaintiff's restrictions since he only evaluated Plaintiff on one occasion. Similarly, Dr. Crockett's opinions are not controlling, as his restrictions were admittedly based upon Plaintiff's self-reported statements rather than on an objective evaluation. In accordance with the proper weight to be afforded to the respective opinions of Dr. Ball and Dr. Strang, see Part VI, infra, the medical evidence indicates Plaintiff was restricted from lifting over fifteen pounds and bending or twisting at the waist. Plaintiff did not perform at this level, however, and restricted his activities to a much greater extent. I, therefore, find that this factor supports the ALJ's determination.

## B.  CREDIBILITY CONCLUSION

Plaintiff also argues that the ALJ did not consider his leukemia in determining the credibility of his subjective complaints.  The ALJ did consider Plaintiff's leukemia, however, and correctly determined that the disease did not render him "disabled" as defined by the Act.  Plaintiff's leukemia was at stage zero and asymptomatic, did not yet require any form of treatment, and was stable.

For this reason and those discussed more fully above, I find that the record contains substantial evidence supporting the ALJ's findings that Plaintiff's subjective complaints of pain were not credible.  Plaintiff's motion for summary judgment on this basis is, therefore, denied.

## IX.  CONCLUSIONS

Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.




*/s/ Robert E. Larsen*
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 24, 2006